

**U.S. Department of Justice**

Criminal Division

---

November 20, 2019

| | |
|---|---|
| **Leslie I. Ballin** | **Manubir S. Arora** |
| Ballin Ballin Ballin & Fishman | Manubir S. Arora |
| 200 Jefferson Ave., Ste. 1250 | 75 West Wieuca Road NE |
| Memphis, TN 38103 | Atlanta, GA 30342 |
| (901) 525 – 6278 | (404) 881 - 8866 |
| lballin@bbfpc.com | manny@mannyarora.com |

      **RE:** *United States v. Petway, et al.*
              CR. No. 19-cr-10041-JDB

Dear Counsel:

We write to supplement the government's September 16, 2019, expert notice. On October 11, 2019, we provided you with a 50-page CV for Dr. Carl Christensen, which included, *inter alia*, his education, training, professional appointments, publications, and current office information.

The government anticipates that Dr. Christensen will testify regarding what constitutes a legitimate medical purpose within the scope of professional practice with regard to prescribing opioids for pain. We anticipate his testimony will include a discussion about what legitimate, professional pain management looks like under generally-accepted standards in the United States. He will testify about techniques and treatments available to practitioners to manage pain, including prescribing opioids.

As part of this discussion, he will testify about applicable state, CDC and FDA guidelines related to opioid use and distribution. We anticipate Dr. Christensen will testify that the CDC has warned that medical professionals should avoid prescribing opioids and benzodiazepines (e.g. Xanax, Alprazolam, Lorazepam) concurrently whenever possible because of the risk of potentially fatal overdose. Prescribing and issuing these two medications around the same time compounds the patient's risk of overdose and death from the prescribed drugs and there is a significant diversion risk of prescribing or issuing these drugs around the same time. A benzodiazepine serves as a "potentiator" for the opioid's euphoric effect by increasing the "high" a user may obtain from opioid and is therefore often sought for this non-legitimate medical purpose. The FDA has also warned that combined use of opioids and benzodiazepines depresses the central nervous system and results in serious side effects, such as slowed or difficult breathing and death. The FDA further warned health care professionals to limit prescribing opioids with benzodiazepines and cautioned that such medications should only be prescribed together when alternative treatment options are inadequate. For a treating physician to prescribe this combination of high-dose opioids and benzodiazepines for a legitimate medical purpose, the physician should determine that the benefits of the drugs outweigh the risk to the patient's life.

In addition, we anticipate Dr. Christensen will testify about specific procedures that comprise the scope of professional practice in general practice, pain management and with respect to opioid prescriptions, and will explain how those procedures are used to mitigate and monitor risk factors. For example, he will testify about urine drug screens (including their purpose and limitations), maintaining patient files, the importance of monitoring PDMP databases (e.g. Tennessee's CSMD), and the importance of physical examinations and other diagnostic testing.

Moreover, Dr. Christensen will testify about the legitimate medical purposes of opioids, their effect on the human body, as well as the risks of prescribing opioids by themselves and in combination with benzodiazepines and/or muscle relaxers. Dr. Christensen may also testify about the risks of prescribing opioids to certain types of patients, such as individuals who may have become dependent upon the medication.

We anticipate that Dr. Christensen will also testify about the purpose and appropriate use of a DEA number, and corresponding scheduled controlled substances. Dr. Christensen may also testify about the risks and signs of opioid addiction, as well as the standards of professional practice when treating a patient who demonstrates those signs.

You have previously received a 68-page report outlining Dr. Christensen's opinions related to a chart review conducted on files obtained from Superior Health. We anticipate that Dr. Christensen will testify about the overall poor documentation of reasons for the narcotics prescribed to the patients whose files he reviewed, the lack of addiction assessment even in patients with strong risk factors for addiction, and that drug testing was not documented and not followed up on. Specifically, we anticipate that Dr. Christensen will testify about the specific patients whose files were reviewed, as reflected in the report (the names are redacted for purposes of this letter). Dr. Christensen's opinions related to these patient files are based on his review of the files and prescription data, and his training and experience (outlined in his CV). Although he may testify about the specific contents of the report, in summary:

- The visits and treatment of Patient SB appear to be outside the standard of care of the practice of medicine. This opinion is based on a review of SB's chart, CSMD data, and Dr. Christensen's training and experience (as outlined in his CV). Specifically, SB, who was prescribed hydrocodone, had abnormal urine drug tests; SB's chart indicates the patient's opioids would be reduced but there does not appear to be a change in the prescriptions; and there was no discussion of safety and CDC guidelines, except that the patient's medication would be reduced (which never occurred). SB was seen ten times in 2017, all billed as high level visits, but there is no indication of the reason for the frequency of the visits, and despite multiple abnormal drug screens, there are only two confirmatory drug tests (in April and May). For example, in December, medications were continued when the drug screen was negative for the prescribed medications, and there is no discussion of this.
- There is no documentation that prescriptions provided to Patient JB were legitimate prescriptions in the usual course of professional practice. Specifically, the patient was prescribed a concerning combination of OxyContin, Adderall, and Xanax. Dr. Christensen did not see any evaluation for addiction, and no documentation of previous prescriptions.
- There is insufficient documentation that Patient SB (2), who had only one visit, was legitimately prescribed Xanax in the usual course of professional practice. SB, who was given Xanax on the first visit, presented with a history of prescriptions for multiple concerning medications. The patient gave a presentation consistent with withdrawal from a controlled substance, but there was no addiction assessment done, and no drug screen done.
- Patient JB(2)'s visits appear to be outside the standard of care of the practice of medicine. JB(2) received hydrocodone between at least July 2016 and February 2018. Dr. Christensen did not see any discussion in the assessment and plan regarding safety, adverse effects, and

- aberrant behavior, and although drug testing and drug screening is done, there are no comments regarding abnormal findings. Moreover, the notes themselves do not appear to document that the patient received hydrocodone. Dr. Christensen also could not find adequate documentation on the last few office visits regarding prescriptions for these narcotics.
- Patient RB appears to have been started on Tramadol in October 2016 with no current opiate use documented. A drug screen was negative for all drugs, and subsequent in-house drug tests were positive for opiates after RB was switched over to a different drug. The patient continued to complain of pain and apparently requested escalation of dose. There is no discussion that Dr. Christensen saw regarding the CDC guidelines; however, a handwritten note in the file discussed weaning and there were no subsequent follow ups. There does not appear to be any other violations of the standard of care of the practice of medicine.
- Care provided to Patient MB appears to be outside the standard of care of the practice of medicine, and there is insufficient documentation that prescriptions provided to MB are legitimate prescriptions. MB received controlled substances from May 2016 through August 2017, including hydrocodone, oxycodone, and Xanax. MB did not have an addiction assessment, urine drug tests do not appear to be discussed in the office visit notes, and a drug test in January 2017 showed no medications whatsoever when the patient had received hydrocodone at least the month before. MB's prescriptions continued into 2017 after the publication of the CDC guidelines without discussion. Although the dosing is at or below 50mg morphine, the lack of discussion of risks and benefits, and assessment for possible addiction, are extremely concerning.
- There is inadequate documentation that prescriptions provided to Patient KB are legitimate in the usual course of professional practice and there are several "red flags" that are extremely concerning to Dr. Christensen. KB's history on laboratory results suggest exposure to hepatitis B and C, and although this is not diagnostic of intravenous drug use, it warrants discussion and evaluation if controlled substances are going to be given. KB was prescribed a dangerous combination of Xanax and morphine, after the CDC and FDA guidelines had been released, without explanation.
- There is insufficient documentation that prescriptions provided to Patient JC were legitimate prescriptions in the usual course of professional practice. Superior Health began seeing JC beginning apparently in June 2016, and was started on hydrocodone at that time. There is no addiction assessment, and there is no discussion of the risks or benefits of hydrocodone that are documented. The patient continues to complain about insomnia, and appears to be prescribed Ambien as well, increasing the risk. The first drug test appears to occur in January 2017, which appears to be six months after the patient's treatment is started. Moreover, there are multiple visits where there does not appear to be documentation by Ms. Petway.
- There is insufficient documentation that prescriptions provided to Patient LC are legitimate prescriptions in the usual course of professional practice. LC, who appears to have been treated between October 2016 and April 2018, was prescribed hydrocodone at a low dose with the very first visits. There were intermittent drug screens, several of which were abnormal for missing medication, which may indicate laboratory error, patient noncompliance, or diversion or abuse (all of which require follow up, but there was no evidence this occurred). The patient started on 10mg a day equivalent of morphine, and

- finished at 45 mg per day. Although there are also several rational explanations for this, none of these are seen in the chart.
- There is insufficient documentation that prescriptions provided to Patient CC are legitimate prescriptions in the usual course of professional practice. CC, treated between April 2016 and December 2018, started on hydrocodone with an escalation of dose up to 40mg per day. CC was also given combinations of Ambien, Xanax, and Flexeril (though Dr. Christensen only located one prescription for Ambien). There was no discussion in the file of the risks and benefits of opioids, or combinations of opioids and sedatives which was done with this patient. Two years of visits in 2017 and 2018 are well after the release of the CDC guidelines and the FDA black box warning against combining opioids and benzodiazepines. There is no documentation that drug screens and urine tests were reviewed by the provider. This patient seems to have appeared monthly at Petway's office to obtain narcotics prescriptions.
- There is insufficient documentation that prescriptions provided to Patient CC(2) were legitimate prescriptions in the usual course of professional practice, and could have been lethal for a patient who was in respiratory compromise. CC(2) appears to have presented with complaints of respiratory problems, and was given medications for what Dr. Christensen presumed to be concern about pneumonia. The patient appears to have received a prescription not included in the chart, and was given a dangerous treatment (Xanax and hydrocodone) for a patient where there are concerns about having abnormal lung function. CC(2) was prescribed these medications multiple times.
- Patient JC(2) received prescriptions that do not appear to be legitimate prescriptions in the usual course of professional practice. JC(2), who was seen in approximately May or June 2016 through December 2018, received continuous prescriptions for opiates and intermittent prescriptions for Xanax. There was frequent in house drug screening, but the office notes appear to lack any discussion of the risks, benefits, or effects on function, and the majority of the office notes do not mention controlled substances at all. Although they are handwritten, many of the notes still appear to be "cut and paste." There is documented alcohol use, and despite this the patient continued to receive significant amount of benzodiazepines and opioids. The patient continued to have high pain scores despite the prescribed medication, and the prescriptions also failed to recognize CDC guidelines. There was also no other treatment extended for anxiety that Dr. Christensen could follow.
- Patient JC(3)'s visits appear to be outside the standard of care of the practice of medicine and there is insufficient documentation that the prescriptions provided were legitimate prescriptions in the usual course of professional practice. The patient was prescribed Tramadol with the first visit, without any assessment for addiction and although a drug screen order is noted, there is nothing in the chart and there is no in-house urine drug screen. The patient returned and received codeine and phentermine; the phentermine, a controlled stimulant, was prescribed despite uncontrolled blood pressure.
- There is inadequate documentation that prescriptions provided to Patient CD are legitimate prescriptions in the usual course of professional practice. Dr. Christensen will testify that there were major issues with the patient's file. The patient received controlled substances on the first documented visit (on that date, the file says, "establish new primary care provider"). There was no review of the possibility of addiction, and the patient presented with a "red flag" combination of hydrocodone and Xanax. Although the patient did have documented physical reasons for chronic pain, there was no discussion of abnormal drug

screens, no prescription searches, no routine evaluation of function, and the narrative is almost uniformly lacking in discussion of controlled substances. CD's visits appear to be monthly visits for the purpose of obtaining narcotics.
- There is no documentation that prescriptions Patient BD received were legitimate prescriptions in the usual course of professional practice. "Red flags" in the file include a history of hepatitis C without explanation, co-occurring psychiatric disorder, use of stimulants which was never addressed, and a drug screen showing no medications. The patient's prescriptions were continued despite this abnormal drug test.
- There is insufficient documentation that prescriptions Patient SD received were legitimate prescriptions in the usual course of professional practice, and appear to be outside the standard of care of the practice of medicine. For example, SD was prescribed hydrocodone on the first visit, without any drug testing or assessment for addiction that Dr. Christensen could find. There appears to be no documentation that the patient was actually previously receiving hydrocodone or why the patient had come to see this new provider. SD had an abnormal drug screen on the third visit showing unprescribed benzodiazepines and oxycodone and cannabis, which was not addressed. There is no documentation that the patient was actually seen by a provider on the last two visits.
- The chart for FF does not reflect whether the patient was actually treated on the first visit; if the patient was prescribed medications, there is no documentation that they were for a legitimate purpose. If the patient had cocaine in the patient's urine for the subsequent visit, this would suggest an alternative reason (addiction) for the prescriptions provided to the patient.
- JF received narcotics for approximately 21/2 years. Although the patient has a documented reason for chronic pain, there is no evaluation for addiction, no previous records or reasons for the patient to be transferring to Petway's care, and there appears to be insufficient documentation that prescriptions provided are legitimate prescriptions in the usual course of professional practice. The patient has multiple abnormal urine drug screens.
- TF's patient file contains multiple issues, including being prescribed three different narcotics on the first date (Xanax, oxycodone, and cough syrup with codeine), no discussion of risks of combining benzodiazepines with two different opioids, and combining despite CDC and FDA guidelines. There are also abnormal drug screens. There is no documentation that these are legitimate prescriptions in the usual course of professional practice and there are strong indicators that this patient suffered from another disorder such as addiction.
- Prescriptions provided to TG lack sufficient documentation to be legitimate prescriptions in the usual course of professional practice. The patient had abnormal drugs screens including cannabis and missing prescribed medications that was never dealt with and there is poor documentation in the file.

Please do not hesitate to let us know if you have questions, or if you would like more information regarding any of the above individuals.

Respectfully,

*s/Jillian Willis*
Jillian Willis
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section