1        UNREDACTED

2        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TENNESSEE
3                  EASTERN DIVISION

4    --------------------------------------------------

5

UNITED STATES OF AMERICA          )
6                                  )
                                   )
VS                                 )NO.  1:19-CR-10041
7                                  )JACKSON, TENNESSEE
                                   )
8    BRITNEY PETWAY, N.P.          )

9

10   --------------------------------------------------

11              CHANGE OF PLEA HEARING
                   JANUARY 3, 2020

12

13

14         BEFORE THE HONORABLE J. DANIEL BREEN,

15           UNITED STATES DISTRICT JUDGE

16

17

18

19

20              KRISTI HEASLEY, RPR
               OFFICIAL COURT REPORTER
21           U.S. COURTHOUSE, SUITE 450
              111 SOUTH HIGHLAND AVENUE
22           JACKSON, TENNESSEE 38301

23

24

25

UNREDACTED TRANSCRIPT

2

1                                APPEARANCES

2

3

4     FOR THE UNITED STATES:

5     JILLIAN D. WILLIS, ESQ.
      U.S. DEPT OF JUSTICE
6     1400 New York Avenue NW
      Washington, DC 20520
7

8

9

10    FOR THE DEFENDANT:

11    LESLIE . BALLIN, ESQ.
      BALLIN BALLIN & FISHMAN
12    200 Jefferson Avenue
      Suite 1250
13    Memphis, TN 38103

14

15

16

17

18

19

20

21

22

23

24

25

                        UNREDACTED TRANSCRIPT

1                            EXAMINATION INDEX

2                          NO TESTIMONY OFFERED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2                        EXHIBITS
3                  NO EXHIBITS MARKED
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1               (Defendant present.)

2               THE COURT:  Good morning.

3               MR. BALLIN:  Morning, Your Honor.

4               Judge, my client is in the conference

5  room.  She's got a couple of questions for me that I

6  would like to answer, if I could have just a moment.

7               THE COURT:  Absolutely.  You go right

8  ahead.

9               MR. BALLIN:  Thank you, Your Honor.

10              THE COURT:  Is there a plea agreement in

11  this matter?

12              MS. WILLIS:  Yes, Your Honor.

13              MR. BALLIN:  Yes.

14              THE COURT:  Do you want me -- if you have

15  a copy, I can at least take a look at it, assuming we're

16  going to proceed.

17              MS. WILLIS:  May I approach?

18              THE COURT:  Yes, ma'am.

19              Is this my copy?  Do you have another copy

20  that she has already executed?

21              MS. WILLIS:  I have other copies, Your

22  Honor.

23              THE COURT:  Okay.

24              MS. WILLIS:  You can keep that copy.

25              THE COURT:  Thank you.

1          (Pause in proceedings.)

2          THE COURT:  Yes, sir.

3          MR. BALLIN:  Your Honor, thank you for the

4     additional time.

5          Ms. Petway, is, I don't want to say this,

6     not used to being in this position, unlike others that I

7     have represented and others that have appeared before

8     Your Honor.  She is ready to enter a plea.  And I do want

9     to thank you again for giving us that additional time

10    this morning.

11         THE COURT:  Sure.  Sure.

12         Are you ready to proceed?

13         MR. BALLIN:  Yes, sir.

14         THE COURT:  If you would, you and your

15    client want to come up to the podium, please.

16         MR. BALLIN:  Come on up.  Sign that,

17    please.

18         THE COURT:  Have you executed that?

19         MS. WILLIS:  Yes.

20         THE COURT:  Okay.  All right.

21         This is in the matter of United States

22    versus Britney Petway, 19-10041.

23         Ms. Petway, the Court understands that you

24    wish to change your plea, and enter a plea of guilty to

25    Counts, I believe it's 1 through 6 of the indictment.

1            Is that correct, ma'am?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Okay.  Now before accepting

4   your plea, Ms. Petway, the Court is going to ask you a

5   series of questions to determine whether your plea is a

6   valid one.  Before I do that, I'm going to ask the clerk

7   to place you under oath.  If you will raise your right

8   hand, please.

9            (Defendant sworn.)

10           THE DEFENDANT:  Yes.

11           THE COURT:  All right.  Would you state

12  your name for the record, please?

13           THE DEFENDANT:  Britney Petway.

14           THE COURT:  All right.  Ms. Petway, as I

15  indicated, I'll be asking you some questions regarding

16  your plea.  If there is anything I ask you that you do

17  not understand or wish to discuss with your attorney, Mr.

18  Ballin, would you let me know?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Okay.  And also I would ask

21  you that as you've been placed under oath in this matter,

22  the Court will assume the answers you are going to give

23  me toady will be truthful.  If it is later determined

24  that any of your responses were not truthful, you could

25  be subject to additional criminal charges including that

UNREDACTED TRANSCRIPT

1  of perjury.

2  Do you understand that, ma'am?

3  THE DEFENDANT:  Yes.

4  THE COURT:  What is your age, please?

5  THE DEFENDANT:  Thirty-four.

6  THE COURT:  How far did you go in school?

7  THE DEFENDANT:  A nurse --

8  THE COURT:  You have a nurse practitioner

9  degree?

10  THE DEFENDANT:  Yes.

11  THE COURT:  Okay.  So is that beyond

12  college or you have other training --

13  THE DEFENDANT:  Yes.

14  THE COURT:  -- beyond college?

15  THE DEFENDANT:  Yes, Masters and

16  Doctorate.

17  THE COURT:  Okay. Now before coming here

18  today, have you taken any type of medication or any other

19  type of drugs or alcoholic beverages that would affect

20  your understanding of these proceedings?

21  THE DEFENDANT:  Medications?  No, sir.

22  THE COURT:  Okay.  Or anything else that

23  might affect your understanding of -- do you understand

24  what we're doing here today, ma'am?

25  THE DEFENDANT:  Yes, sir.

1           THE COURT:  Okay.  Now have you had

2    sufficient opportunity to discuss this matter with your

3    attorney, Mr. Ballin?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  And are you satisfied with his

6    advice and representation given to you in this case?

7           THE DEFENDANT:  Yes.

8           THE COURT:  Now I want to go over with you

9    some rights that you will be waiving or giving up by

10   reason of your plea.

11          Do you understand that under the

12   Constitution and laws of the United States that you are

13   entitled to a trial by a jury on the charges in this

14   indictment?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you also understand that at

17   that trial you would be presumed to be innocent of the

18   charges, and the government would have prove you were

19   guilty by competent evidence beyond a reasonable doubt?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Do you understand that at the

22   trial the government would have to put on witnesses here

23   in this courtroom in your presence?

24          And your attorney could cross-examine

25   those government witnesses, could object to any evidence

UNREDACTED TRANSCRIPT

1    that the government offers, and could offer evidence on

2    your behalf.

3                    THE DEFENDANT:  Yes.

4                    THE COURT:  Do you also understand that

5    Mr. Ballin, as your attorney, could have what is called

6    subpoenas issued to compel the production of documents or

7    the attendance of witnesses at any hearing or at the

8    trial of this case, should it proceed to that point?

9                    THE DEFENDANT:  Yes.

10                   THE COURT:  Do you also understand that at

11   the trial you would have a right to testify as a witness,

12   if you wanted to do so?

13                   But you would also have a right not to

14   testify.  And if you decided not to testify, that could

15   not be used against you in any way.

16                   THE DEFENDANT:  Yes.

17                   THE COURT:  Do you also understand that if

18   you plead guilty and I accept your plea, you will be

19   giving up your right to a trial and the rights I've just

20   gone over with you?  You would also be giving up your

21   right to appeal your conviction.

22                   Do you understand that, ma'am?

23                   THE DEFENDANT:  Yes.

24                   THE COURT:  And as I indicated, there

25   would not be a trial based upon your plea.  And the Court

UNREDACTED TRANSCRIPT

1  would then sentence you, after considering what is called

2  a presentence report that the probation office is going

3  to prepare.  And I'll go over that with you in just a

4  moment.  All right?

5              THE DEFENDANT:  Okay.

6              THE COURT:  Ms. Petway, having gone over

7  those rights with you, ma'am, is it still your intention

8  to enter a plea of guilty to Counts 1 through 6 of the

9  superseding indictment?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Have you seen a copy of the

12  indictment?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Have you had a chance to read

15  it over and discuss it with your attorney?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.  I'm going to go

18  over with you the substance of the superseding indictment

19  one more time, simply to make sure you're fully apprized

20  of what it is you are being charged with in this case.

21             The superseding indictment states as

22  follows:

23             The defendant, Britney Petway, was a Nurse

24  Practitioner licensed by the state of Tennessee.  It's

25  alleged that Petway maintained a Drug Enforcement

1    Administration, a number.  That you issued prescriptions

2    for controlled substances, including Schedule II

3    controlled substances of Oxycodone and Hydrocodone, and

4    Schedule IV controlled substances Alprazolam and

5    Clonazepam, Clonazepam, I may be mispronouncing some of

6    those, at Superior Health and Wellness Clinic, LLC, in

7    Jackson, Tennessee, also known as Superior Health,

8    outside the usual scope of professional practice and

9    without a legitimate medical purpose.

10            Paragraph 2.  Defendant Dr. Charles

11   Alston, also referred to as Alston, was a licensed

12   medical doctor in Tennessee.  Alston maintained a DEA

13   number and was the supervising physician for you, or for

14   Petway, at Superior Health while you issued prescriptions

15   for controlled substances outside of the usual scope of

16   professional practice, and without a legitimate medical

17   purpose.

18            Paragraph 3.  The Controlled Substances

19   Act, also referred to as CSA, govern the manufacturing,

20   distribution and dispensing of controlled substances in

21   the United States.  With limited exceptions for medical

22   professionals, the CSA makes it unlawful for any person

23   to knowingly or intentionally manufacture, distribute or

24   dispense a controlled substance, or conspire to do so.

25            Paragraph 4.  Medical practitioners, such

1    as physicians and nurse practitioners, who are authorized

2    to prescribe controlled substances by the jurisdiction in

3    which they were licensed to practice medicine, were

4    authorized under the CSA to prescribe, or otherwise

5    distribute controlled substances if they were registered

6    with the Attorney General of the United States, pursuant

7    to 21, United States Code, Section 822(b) and 21, Code of

8    Federal Regulations, Section 1306.03.

9              Upon application by the practitioner, the

10   DEA assigned a unique registration number to each

11   qualifying medical practitioner, including physicians and

12   nurse practitioners.

13             Paragraph 5.  The CSA, in its implementing

14   regulations, set forth which drugs and other substances

15   were defined by law as, quote, controlled substances,

16   unquote, and assigned those controlled substances to one

17   of five schedules, Schedule I, II, III, IV or V,

18   depending on their potential for abuse, likelihood of

19   physical or psychological dependency, accepted medical

20   use, and accepted safety for use under medical

21   supervision.

22             Paragraph 6.  A controlled substance

23   assigned to Schedule II meant that the drug had a high

24   potential for abuse, was highly addictive, and that the

25   drug had a currently accepted medical use and treatment

1    in the United States, or currently accepted medical use

2    with severe restrictions.

3                    Abuse of a Schedule II controlled

4    substance could lead to severe psychological and/or

5    physical dependence.

6                    Pursuant to the CSA, and its implementing

7    regulations, Hydrocodone was classified as a Schedule II

8    controlled substance after October 2014, before which

9    time it was classified as a Schedule III controlled

10   substance.  It was an opioid pain medication.

11                   B.  Oxycodone was classified as a Schedule

12   II controlled substance.  Oxycodone was sold generically

13   and under a variety of brand names including Oxycontin,

14   Roxicodone, Endocet and Percocet.

15                   Oxycodone, an opioid pain medication, is

16   about 50 percent stronger than Morphine.

17                   Paragraph C.  Morphine Sulfate was

18   classified as a Schedule II controlled substance.

19                   D.  Hydrocodone and Oxycodone were among

20   the Schedule II opioid controlled substances that had the

21   highest potential for abuse and associated with fatal

22   overdose.

23                   Paragraph 7.  A controlled substance

24   assigned to Schedule IV meant that the drug or other

25   substances had a lower potential for abuse than Schedule

1   II drugs or other substances.

2              The drug or other substances had a

3   currently accepted medical use in the United States.  And

4   abuse of this drug or other substances may lead to a

5   physical, to a limited physical dependence or

6   psychological dependence relative to the drugs or other

7   substances in the higher schedules.

8              Pursuant to the CSA and its implementing

9   regulations, Alprazolam, a benzodiazepine, was classified

10  as a Schedule IV controlled substance.

11             Alprazolam, sometimes prescribed under the

12  brand name Xanax, was a medication used to treat anxiety.

13             B.  Clonazepam, a benzodiazepine, was

14  classified as a Schedule IV controlled substance.

15             Clonazepam, sometimes prescribed under

16  brand name Klonopin, if I'm pronouncing that --

17             THE DEFENDANT:  Klonopin.

18             THE COURT:  Thank you.  Was a medication

19  used to treat anxiety and seizures.

20             Paragraph 8.  Chapter 21 of the Code of

21  Federal Regulations, Section 1306.04 govern the issuance

22  of prescriptions.  And provided, among other things, that

23  a prescription for a controlled substance, quote, must be

24  issued for the legitimate medical purpose by an

25  individual practitioner acting in the usual course of his

UNREDACTED TRANSCRIPT

1    or her professional practice, unquote.

2                    Paragraph 9.  Chapter 21 of the Code of

3    Federal Regulations, Section 1306.04, further directed

4    that, quote, an order purporting to be a prescription

5    issued not in the usual course of professional treatment

6    is not a prescription within the meaning and intent of

7    the CSA.  And the person knowingly filling such a

8    purported prescription, as well as the person issuing it,

9    should be subject to the penalty provided for violations

10   of the provisions of law relating to controlled

11   substances, unquote.

12                   Paragraph 10.  Chapter 0880-6 of the Rules

13   of Tennessee State Board of Medical Examiners govern the

14   supervision of nurse practitioners by physicians in

15   Tennessee.

16                   According to the regulations, a

17   supervisory physician should be responsible for ensuring

18   compliance with the applicable standard of care.

19                   Rules of Tennessee Board of Medical

20   Examiners 0880-6-.02, Subsection 6.

21                   Additionally, a supervising physician

22   shall develop clinical guidelines in collaboration with

23   the certified nurse practitioner, to included his method

24   of documenting consultation and referral.

25                   Once every 10 business days, the

1    supervising physician shall make a personal review of the

2    historical, physical and therapeutic data, and shall so

3    certify by signature on any patient within 30 days when a

4    controlled substance has been prescribed.

5              Citing rules of Tennessee Board of Medical

6    Examiners 0880-6-.02, Subsection 7(e).

7              Paragraph 11.  It is well known that the

8    combination of high dose opioids and benzodiazepines, for

9    example Alprazolam, in any dose have significant impact

10   upon the risk of patient intoxication and overdose.

11             For a treating physician to prescribe this

12   combination of high doze opioids and benzodiazepines for

13   a legitimate medical purpose, physician needed to

14   determine at a minimum that the benefits of the drugs

15   outweigh the risk to the patient's life.

16             Paragraph 12.  On March 16, 2016, the

17   Centers for Disease Control and Prevention, the CDC,

18   issued CDC guidelines for prescribing opioids for chronic

19   pain.

20             In that guidance the CDC warned that

21   medical professionals should avoid prescribing opioids

22   and benzodiazepines, for example, Xanax, Alprazolam or

23   Lorazepam, concurrently whenever possible because of the

24   risk of potentially fatal overdose.

25             Prescribing and issuing these two

UNREDACTED TRANSCRIPT

1    medications around the same time compounds the patient's

2    risk of overdose and death from the prescribed drugs by

3    four times.

4            Moreover, there is a significant diversion

5    risk of prescribing or issuing these drugs around the

6    same time.

7            Benzodiazepines serves as a, quote,

8    potentiator, quote, for the opioids euphoric affect by

9    increasing the, quote, high, unquote, a user may obtain

10   from opioids.  It is, therefore, offer sought for this

11   non-legitimate medical purpose.

12           Paragraph 13.  On August 31st, 2016, the

13   U.S. Food and Drug Administration issued a, quote, black

14   box, unquote, warning, its strongest warning to the drug

15   labeling of prescription opioid pain medicines and

16   benzodiazepines.

17           The FDA specifically warned that combined

18   use of opioids and benzodiazepines suppresses the central

19   nervous system and results in serious side effects, such

20   as slowed or difficult breathing and death.

21           The FDA further warned healthcare

22   professionals to limit prescribing opioids with

23   benzodiazepines, and cautioned that such medication

24   should only be prescribed together when alternative

25   treatment options are inadequate.

1              Paragraph 14.  Urine drug screens were

2    relied upon in the pain management industry as a means of

3    identifying patient's noncompliance with the patient's

4    treatment plan.

5              Urine drug screens were used to identify

6    abuse of elicit and controlled substances not prescribed

7    to a patient, and to identify a patient's failure to take

8    drugs prescribed for the patient's treatment of pain.

9              Do you wish to consult with your attorney

10   for something, Ms. Petway?  Did y'all need to talk?

11             MR. BALLIN:  We are good.  Thank you,

12   Judge.  Appreciate that.

13             THE COURT:  Just wanted to make sure.

14             Paragraph 15.  Tennessee's Controlled

15   Substances Monitoring Program, CSMD, was a means of

16   detecting a pain management patient's noncompliance with

17   a patient's treatment plan.

18             A CSMD report contained prescription data

19   for all controlled substances dispensed by pharmacies in

20   the state of Tennessee.  Pharmacists were required to

21   report the patient's name, the particular controlled

22   substance and dosage dispensed, the quantity dispensed,

23   the number of days supplied, the prescription prescribing

24   physician's name, the date the prescription was issued,

25   the dispensing pharmacy's name, the type of payment, and

1  the date the controlled substances were dispensed.

2             Count 1, conspiracy to distribute and

3  dispense controlled substances.

4             Paragraph 16.  Paragraphs 1 through 15 of

5  the indictment are re-alleged and incorporated by

6  reference and fully set forth herein.

7             Paragraph 17.  From in or about July 2016,

8  through in or around April 2019, in the Western District

9  of Tennessee, and elsewhere, the defendants Petway and

10  Alston, did knowingly and intentionally combine,

11  conspire, confederate and agree with each other, and with

12  other persons both known and unknown to the Grand Jury,

13  to violate Title 21, United States Code, Section

14  841(a)(1).

15             That is, to knowingly and intentionally

16  unlawfully distribute and dispense mixture and substances

17  containing a detectable amount of Schedule II controlled

18  substances, including Oxycodone and Hydrocodone, not for

19  a legitimate medical purpose and outside the scope of

20  professional practice.  All in violation of Title 21,

21  United States Code, Section 846.

22             Paragraph 18 is entitled purpose of the

23  drug conspiracy.

24             It was the purpose and object of the

25  conspiracy for defendants to unlawfully enrich themselves

1    by, among other things:

2              A, prescribing controlled substances

3    without a legitimate medical purpose and outside of scope

4    of professional practice;

5              B, generating large profits from those

6    prescriptions;

7              And C, diverting the proceeds from those

8    controlled substance prescriptions for the personal use

9    and benefits of the defendants and their coconspirators

10   known and unknown to the Grand Jury.

11             Next is the manner and means of the

12   conspiracy.  Paragraph 19.

13             The manner and means for which the

14   defendant sought to accomplish the purpose and object of

15   the conspiracy including, among other things:

16             Paragraph 20.  Petway would and did use

17   her status as a licensed nurse practitioner, her DEA

18   registration number, and her medical practice at Superior

19   Health, to knowingly and intentionally prescribe

20   Oxycodone, Morphine and Hydrocodone, in addition to

21   various benzodiazepines including Alprazolam and

22   Clonazepam, and other controlled substances outside the

23   course of professional practice and not for a legitimate

24   medical purpose.

25             Paragraph 21.  Petway paid Alston to be

UNREDACTED TRANSCRIPT

1    her supervising physician.

2              Paragraph 22.  Alston gave Petway's

3    practice the appearance of legitimacy by signing the

4    State of Tennessee Board of Nursing, quote, Advanced

5    Practice Nurse Notice and Formulary, unquote, form, filed

6    with the state and stating that he was Petway's

7    supervising physician from on or about March 11th, 2016,

8    to at least through on or about April of 2019.

9              Paragraph 23.  Alston purported to

10   supervise Petway at Superior Health, and was responsible

11   for reviewing all of Petway's patient charts for the

12   patients who were issued prescriptions for controlled

13   substances.

14             Alston approved Petway's prescriptions for

15   controlled substances, even though the majority were not

16   for a legitimate medical purpose and were outside the

17   scope of the medical practice, professional practice,

18   excuse me.

19             Paragraph 24.  Petway and Alston were

20   required under Tennessee law to register Superior Health

21   as a pain management clinic with the state of Tennessee,

22   but did not.

23             Paragraph 25.  Under Alston's supervision

24   Petway often:

25             Paragraph A, signed blank prescriptions

1    for purported patients and gave them to Superior Health

2    employees to compete as to the type of controlled

3    substance and to the patients' name;

4                    B, prescribed controlled substances

5    without ever seeing or treating the purported patients;

6                    C, prescribed controlled substances to

7    close friends and relatives;

8                    D, prescribed the dangerous drug

9    combination known as the, quote, Holy Trinity, unquote,

10   comprised of opioids, usually Oxycodone, benzodiazepines,

11   usually Alprazolam, and the muscle relaxer Carisoprodol;

12                   E, prescribed dangerous combinations of

13   opioids and benzodiazepines;

14                   F, failed to monitor patients for

15   addiction;

16                   G, failed to monitor patients for a

17   diversion of the prescribed drugs into the illegal drug

18   market;

19                   H, ignored drug scenes showing patients

20   were taking illicit drugs;

21                   I, ignored drug screens showing patients

22   were not taking the controlled substances prescribed

23   them, and, therefore, were likely diverting the drugs to

24   other users;

25                   J, failed to corroborate patients' reports

1  of pain through x-rays, MRIs and other diagnosis tools;

2  K, failed to properly examine patients;

3  L, failed to properly diagnose patients;

4  M, failed to provide treatment plans for

5  patients;

6  And N, failed to recommend alternative

7  forms or modalities of treatment for pain.

8  All of this being in violation of 21,

9  United States Code, Section 846.

10  So, Ms. Petway, do you understand what

11  you're being charged with in Count 1 of the indictment,

12  ma'am?

13  THE DEFENDANT:  Yes.

14  THE COURT:  Counts 2 through 6 charges you

15  with unlawfully distributing and dispensing controlled

16  substances and aiding and abetting, in violation of 21,

17  United States Code, Section 841(a)(1)(C), (b)(1)(C) and

18  18, United States Code, Section 2.

19  Paragraph 26.  All previous paragraphs of

20  the superseding indictment are re-alleged and

21  incorporated by reference as though fully set forth

22  herein.

23  Paragraph 27.  During the dates specified

24  below, in the Western District of Tennessee, and

25  elsewhere, defendants Britney Petway and Charles Alston,

1  aided and abetted by each other, and/or others known and

2  unknown to the Grand Jury, and aiding and abetting each

3  other and others known and unknown to the Grand Jury, did

4  intentionally and knowingly distribute and dispense, and

5  caused to be distributed and dispensed, outside the usual

6  course of professional practice, and not for a legitimate

7  medical purpose, the controlled substances alleged in a

8  following counts.

9       Count 2.  The range between April 19th of

10  2018 to August 13th of 2018.  The controlled substance is

11  Morphine Sulfite.  The patient is K.B.  And the date of

12  birth of, I assume, the patient is 5/23/67.

13       Count 3.  The date range is July 21st of

14  2016 to April 25th of 2018.  Controlled substances

15  involved include Hydrocodone and Oxycodone.  The patient

16  initials are J.C.  Their date of birth is 11/4/91.

17       Paragraph 4.  The date range is July 7,

18  2016 to November 22nd of 2016.  The controlled substance

19  is Oxycodone HCL.  The patient initials were B.D.  The

20  date of birth of that patient is 2/5/81.

21       Count 5.  From the date range of July 5th

22  of 2016 to June 18th of 2018.  The specific controlled

23  substance is Hydrocodone.  The patient initials are C.D.

24  And their date of birth is 5/18/54.

25       Count 6.  January, the date range is

1    January 30th of 2017 to May 17th of 2018.  The controlled

2    substance is Alprazolam, also known as Xanax.  The

3    patient initials is C.D.  And the patient's date of birth

4    is 5/18/54.

5              These acts all being in violation of Title

6    21, United Sates Code, Section 841(a)(1), (b)(1)(C) and

7    18, United States Code, Section 2.

8              Do you understand what you are being

9    charged with in Counts 2 through 6, ma'am?

10             THE DEFENDANT:  Yes.

11             THE COURT:  There is also a notice of

12   criminal forfeiture under 21, United States Code, Section

13   853.

14             Paragraph 28, indicates the allegations

15   contained in Counts 1 through 6 of the indictment are

16   hereby re-alleged and incorporated by reference for the

17   purposes of alleging forfeitures, pursuant to 21, United

18   States Code, Section 853.

19             Paragraph 29, pursuant to Title 21, United

20   States Code, Section 853, the United States gives notice

21   to defendants Petway and Alston that upon conviction of

22   an offense in violation of 21, United States Code,

23   Section 841, the following property shall be subject to

24   forfeiture.

25             A.  All property constituting or derived

UNREDACTED TRANSCRIPT

1    from any proceeds obtained directly or indirectly as a

2    result of such offense.

3                    B.  All property used or intended to be

4    used in any manner or part to commit, or to facilitate

5    the commission of the offense.

6                    Paragraph 30.  Defendant Petway and Alston

7    are notified that upon conviction a money judgment may be

8    imposed equal to the total value of the property subject

9    to forfeiture.

10                   It says in paragraph 31.  In the event

11   that one or more conditions listed in Title 21, United

12   States Code, Section 853(p) exists, United States will

13   seek to forfeit any other property of defendants up to

14   the total value of the property subject to forfeiture.

15                   Do you understand what the possible

16   criminal forfeiture might be involved here, ma'am?

17                   THE DEFENDANT:  Yes.

18                   THE COURT:  Now, Ms. Petway, the -- sorry.

19   Do the penalties.  I apologize.

20                   The potential penalty for Count 1, which I

21   just reviewed with you, could be a term of imprisonment

22   of not more than 20 years, a fine of up to $1 million, or

23   both, at least three years supervised release, along with

24   a mandatory special assessment of $100.

25                   Counts 2 through 6 could be a term of

1  imprisonment of not more than 20 years, a fine of up to

2  $1 million fine, or both, at least three years supervised

3  release, along with a mandatory special assessment of

4  $100.

5          So do you understand what the possibility

6  penalties are regarding Counts 1 through 6, ma'am?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Now, Ms. Petway, do you

9  understand that any sentence that you might receive in

10 this case would be without what is called parole?

11         Parole is a term sometimes used in State

12 Court criminal matters, whereby a person who is sentenced

13 there could be released earlier from their term of

14 imprisonment and placed on parole.  But that concept does

15 not apply here in Federal Court.

16         Do you understand that, ma'am?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Now with respect to the period

19 of supervised release that I mentioned to you in

20 describing the penalty aspect of your charge, do you

21 understand that there would be a period of supervision by

22 the probation office after your release from any type of

23 jail time or incarceration that you might receive?

24         And that if you violate the conditions of

25 your supervised release, that could result in you serving

1   additional time in jail up to the length of that

2   supervised release period.

3                    Do you understand that, ma'am?

4                    THE DEFENDANT:  Yes.

5                    THE COURT:  Now has anyone threatened you

6   or tried to force you in any way to plead guilty to these

7   charges?

8                    THE DEFENDANT:  No.

9                    THE COURT:  The Court has received a

10  document entitled a plea agreement.  It is five pages in

11  length.  It appears to have your signature, along with

12  that of your attorney, Mr. Ballin, Leslie Ballin, along

13  with that of Ms. Willis, all on page five.

14                   I'm going to ask the clerk to hand the

15  plea agreement back to you and ask if you would confirm

16  that is your signature on the plea agreement.

17                   Is that your signature, ma'am?

18                   THE DEFENDANT:  Yes, sir.

19                   THE COURT:  Ms. Petway, did you sign that

20  document following your review of it with your attorney

21  freely and voluntarily?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  All right.  Ms. Willis, are

24  you going to go over the terms of the plea agreement with

25  Ms. Petway?

1           MS. WILLIS:  Yes, sir.

2           THE COURT:  All right.  Please listen to

3  what Ms. Willis has to say.  I'll be asking you some

4  questions about that following her review of it.  Just

5  listen to what she has to say.

6           Go ahead, Ms. Willis.

7           MS. WILLIS:  Under the terms of the plea

8  agreement the defendant agrees that she is pleading

9  guilty to the superseding indictment because she is

10  guilty of the charges contained within.

11          The agreed upon value of the property

12  subject to forfeiture for defendant's commission of the

13  offenses to which she has agreed to plead guilty is

14  $9,000.

15          Defendant will not contest, challenge, or

16  appeal in any way the administrative or judicial, civil

17  or criminal forfeiture to the United States of the agreed

18  upon value of property subject to forfeiture.

19          The defendant consents to entry of any

20  order, declaration --

21          THE COURT REPORTER:  Wait.  Wait.  Slow

22  down, please.

23          MS. WILLIS:  Okay.  My apologies.

24          Regarding such property, and agrees to

25  waive the time limitation for the administrative

1  forfeiture of the agreed upon funds.

2              The defendant further agrees to hold the

3  government, officers, agents, and employees harmless from

4  any claim whatsoever in connection with the seizure,

5  forfeiture, storage, or disposal of the such property.

6              And just so everyone knows where I'm at,

7  I'm on 2C.

8              If she had received a trial and had been

9  convicted, she would have the right to appeal the

10 conviction.  She understands that by pleading guilty she

11 give up the right to give up, the right to appeal the

12 conviction.

13             Based on concessions made in this plea

14 agreement by the United States, she also hereby waives

15 her right to appeal her sentence, unless the sentence

16 exceeds the maximum permitted by statute, or is the

17 result of an upward departure from the guideline range

18 that the Court establishes at sentencing.

19             Except with respect to claims of

20 ineffective assistance of counsel, or prosecutorial

21 misconduct, she waives her right to challenge the

22 sufficiency or the voluntariness of her guilty plea on

23 direct appeal or in any collateral attack.

24             The special assessment of $600 is due and

25 payable to the U.S. District Court Clerk's Office.  And

1    the defendant agrees to provide the United States with

2    evidence of payment immediately after sentencing.

3                  And this writing constitutes the entire

4    plea agreement between the defendant and the United

5    States with respect to the plea of guilty.  No additional

6    promises, representations or inducements, other than

7    those referenced in this plea agreement, have been made

8    to the defendant or to the defendant's attorney with

9    regard to this plea, and none will be made or entered

10   into unless in writing and signed by all parties.

11                  I'm now moving on to page two, number

12   three.

13                  The defendant admits that if put it its

14   burden at trial, the government would be able to prove

15   the following beyond a reasonable doubt.

16                  Does the Court want me to continue with

17   the proffer?

18                  THE COURT:  Go ahead and cover that at

19   this point, if you would.

20                  MS. WILLIS:  From in and around June 2016

21   to in and around April 2019, defendant Petway owned and

22   operated Superior Health and Wellness, located in the

23   Eastern Division of the Western District of Tennessee.

24                  While practicing at Superior Health, Ms.

25   Petway, a Nurse Practitioner, distributed Hydrocodone,

1   Oxycodone, Morphine and Alprazolam outside the scope of

2   professional practice and not for legitimate medical

3   purpose.

4             Specifically, Ms. Petway unlawfully

5   distributed Morphine Sulphate to K.D. from April 2018

6   until August of 2018.

7             Hydrocodone and Oxycodone to J.C. from

8   July 2016 until April 2018.

9             Oxycodone to B.D. from July 2016 to

10  November 2016.

11            And Hydrocodone and/or Alprazolam to C.D.

12  from July 2017 to June 2018.

13            These prescriptions were provided to these

14  four patients over the course of approximately 50 patient

15  visits during the relevant conduct period.  And Ms.

16  Petway, through Superior Health, received approximately

17  $9,000 for these crimes, which she has agreed to forfeit

18  above.

19            During the relevant conduct period, Dr.

20  Charles Alston was Ms. Petway's preceptor or supervising

21  physician.  He had access to her controlled substance

22  charts and reviewed patient charts monthly at her

23  practice.

24            Ms. Petway, through Superior Health, paid

25  Dr. Alston approximately $750 per month to be her

1    preceptor.  Without Dr. Alston, Ms. Petway could not

2    write the prescriptions detailed above.

3                    Ms. Petway conspired with Dr. Alston, and

4    Dr. Alston aided and abetted in distributing controlled

5    substances outside the scope of professional practice and

6    not for a legitimate medical purpose.

7                    On page three, number four.  The defendant

8    understands that if United States receives information

9    between the signing of this agreement and the time of the

10   sentencing that the defendant has previously engaged in,

11   or if she engages in the future, conduct inconsistent

12   with the acceptance of responsibility, including, but the

13   limited to, participation in any additional criminal

14   activities between now and the time of sentencing, this

15   position could change.

16                   Should it be judged by the United States

17   that the defendant has committed or attempted to commit

18   any additional crimes, or has engaged in any conduct

19   constituting obstruction or impeding justice within the

20   meaning of the United States Sentencing Guidelines,

21   Section 3C1.1, from the date of the defendants signing of

22   this plea agreement, to the date of the defendant's

23   sentencing, or if the defendant attempts to withdraw the

24   plea, the government would be released from its

25   obligations, and would become free to argue for any

UNREDACTED TRANSCRIPT

1  sentence within the statutory limits.

2              Such a breach by the defendant would not

3  release the defendant from her guilty plea.

4              The defendant further expressly waives her

5  rights pursuant to 410(a) of the Federal Rules of

6  Evidence upon affixing her signature to this plea

7  agreement.

8              The defendant understands and agrees that

9  in the event that the defendant violates the plea

10 agreement, the defendant does not enter her plea of

11 guilty, or her guilty plea is for any reason withdrawn,

12 any statements made by the defendant to law enforcement

13 agents, or an attorney for the prosecuting authorities

14 during plea discussion, any statements made by the

15 defendant during any court proceeding involving the

16 defendant's plea of guilty, including the agreed facts

17 set forth herein, and any other factual basis or

18 summaries signed by the defendant, and any leads from

19 such statement, factual basis, or summaries shall be

20 admissible for all purposes against the defendant in any

21 and all criminal proceedings.

22             The parties agree that the defendant's

23 base offense level including relevant conduct under the

24 United States Sentencing Guidelines Section 2D1.1(c)(8)

25 is 24.

1          Specifically, defendant admits that during

2   the relevant time period the defendant conspired to

3   distribute and did distribute Oxycodone, Hydrocodone,

4   Morphine and Alprazolam.  And this was knowingly and

5   intentionally done with no legitimate medical purpose and

6   outside the scope of professional practice.

7          The converted drug weight of these

8   prescriptions is at least 100 kilograms, but less than

9   400 kilograms.

10          And that's the agreed weight under the

11   United States Sentencing Guidelines Section 2D1.1(c)(8).

12          The parties do not agree on whether or not

13   the special skill enhancement applies, only that the base

14   offense level is 24.

15          Pursuant to Section 3E1.1(a) and (b) of

16   the United States Sentencing Guidelines, the government

17   agrees to a three level decrease in the offense level for

18   the defendant's timely acceptance of responsibility,

19   providing that the defendant demonstrates an acceptance

20   of responsibility for the offense up to and including the

21   time of sentencing.

22          If the United States receives information

23   between the signing of this agreement and the time of the

24   sentencing that the defendant has previously engaged in,

25   or if she engages in the future conduct inconsistent with

1   the acceptance of responsibility, including, but not

2   limited to, participation in any additional criminal

3   activities between now and the time of sentencing, this

4   position could change.

5               If the defendant satisfies the

6   requirements of Section 5C1.2 of the United States

7   Sentencing Guidelines, the government agrees not to

8   oppose the application of the safety valve provisions at

9   sentencing.

10              The United States agrees not to allocute

11  for a fine greater than $10,000.  This fine is separate

12  from, and does not include the agreed upon forfeiture

13  amount.

14              Neither the United States, nor any law

15  enforcement officer can or has made promises or

16  representations as to what the sentence imposed by the

17  Court will be.

18              By signing this agreement the defendant

19  affirms that she is satisfied with her lawyer's counsel

20  and representations, and freely and voluntarily enters

21  into the plea agreement.

22              And the defendant understands that this

23  writing constitutes the entire plea agreement between the

24  parties with respect to the plea of guilty.

25              No additional promises, representation or

1   inducements, other than those referenced in this plea

2   agreement, have been made to the defendant or to the

3   defendant's attorney with regard to this plea, and none

4   will be made or entered into unless in writing and signed

5   by all parties.

6              THE COURT:  Ms. Petway, is this your

7   understanding as to the terms of the plea agreement you

8   had with the government, ma'am?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Now as I mentioned to you,

11  there is going to be a presentence report prepared in

12  this case by the probation office.

13             Until the Court has had a chance to

14  receive and review that document, I will not be making a

15  decision, at least today, as to whether I will accept the

16  plea agreement.

17             Now if for some reason the Court did not

18  accept the plea agreement, and as I sit here today I'm

19  not sure of any reason why I would not, but if for some

20  reason I did not, that would not permit you to withdraw

21  your plea at a later date.

22             Do you understand that, ma'am?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Now have you and Mr. Ballin

25  had an opportunity to discuss generally the application

1    of, and it's been mentioned to you in the plea agreement,

2    the application of what is called the United States

3    Sentencing Guidelines to your case?

4              Have y'all talked about that, ma'am?

5              THE DEFENDANT:  Yes.

6              THE COURT:  I'm sure as Mr. Ballin

7    described to you, those guidelines provide to this Court

8    general ranges of sentencing that I can consider in

9    determining what the appropriate sentence might be in any

10   case.

11             Those guidelines are no longer mandatory

12   upon the Court, they're only advisory.  However, I'm

13   still directed to consider them, along with other factors

14   that Congress has established in determining what an

15   appropriate sentence might be in any given case.

16             I mentioned the presentence report a

17   couple of times.  The probation office will submit that

18   document.  A copy will be given to myself, to your

19   attorney, and to the governments attorney.

20             Mr. Ballin will have the opportunity to

21   review it with you and to file a position paper or any

22   objections you might have to the contents of that report.

23             It will contain information about the

24   charges in this indictment, about any prior criminal

25   record you may have, as well as other information such as

1  your family history, medical history, employment history,

2  things of that nature.

3  It may also make a recommendation

4  regarding a sentence in this case.  You will see that

5  recommendation and have a chance to discuss that with

6  your attorney.

7  Now I'm not bound by that recommendation,

8  but I will consider it in making my determination about

9  the sentence to be imposed in this case.

10  Do you understand that, ma'am?

11  THE DEFENDANT:  Yes, sir.

12  THE COURT:  Now, ma'am, the Court has

13  previously advised you that you would be giving up your

14  right to appeal your conviction, that is a finding of

15  guilt, if you do plead guilty to this charge.

16  Now as I understand from the plea

17  agreement it indicates that you, if the Court accepts it,

18  you will be waiving your right to appeal your sentence

19  except in two instances, as I believe it's mentioned in

20  page two.

21  One being that, if the Court sentenced you

22  above the statutory maximum, or if at the time of

23  sentencing I made a determination about what the advisory

24  guideline range was and sentenced you above that range.

25  In other words, other than those two

1   instances, you would be otherwise waiving or giving up

2   your right to appeal your sentence.

3                    Is that your understanding, ma'am?

4                    THE DEFENDANT:  Yes, sir.

5                    THE COURT:  Okay.  Now other than

6   conversations you may have had with Mr. Ballin about how

7   the advisory guidelines might apply in your case, has

8   anyone else made any type of promise or prediction to you

9   about what your sentence would be if you plead guilty to

10  these charges?

11                   THE DEFENDANT:  No.

12                   THE COURT:  Now the government has gone

13  over with you the facts that it intended or would have

14  shown, and which apparently you are admitting to as a

15  result of this case.  Is that correct?

16                   Are you admitting to those facts as set

17  forth in the plea agreement, ma'am?

18                   THE DEFENDANT:  Yes.

19                   THE COURT:  Okay.  And are you admitting

20  to those facts because you are, in fact, guilty of those

21  charges, ma'am?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  All right.  Ms. Petway, the

24  Court has advised you of your right to a trial and your

25  other rights in connection with this matter.

1          The Court does find -- sorry.  Is there
2   something you...
3               MR. BALLIN:  We're good.
4               THE COURT:  Okay.  The Court does find
5   that you are freely and voluntarily pleading guilty to
6   Counts 1 through 6 of the indictment.
7               Having acknowledged your guilt, I'm going
8   to accept your plea and your admission, and enter a
9   judgment of guilty based on that plea.
10              When will this matter be set for
11  sentencing, please?
12              THE CLERK:  On Thursday, April 9th, 2020,
13  at 10:00 o'clock.
14              THE COURT:  Is that all right with the
15  defendant?
16              MR. BALLIN:  That's good, Your Honor.
17              THE COURT:  Ms. Willis, is that all right
18  with the government?
19              MS. WILLIS:  Yes, Your Honor.
20              THE COURT:  All right.  Ms. Petway, that
21  will be the date of your sentencing, ma'am.
22              Do you have any questions about what the
23  Court has been over with you this morning?
24              MR. BALLIN:  No, sir.
25              THE COURT:  What about her present bond

1  status, Ms. Willis?

2              MS. WILLIS:  We're not asking for any

3  change in her bond status.

4              THE COURT:  All right.  My understanding,

5  there has been no problems with that.  So I'm going to

6  allow you to stay on your present bond status.

7              Of course, any obligations and reporting

8  requirements you've been under, you need to continue to

9  follow those.

10             Do you understand that, ma'am?

11             THE DEFENDANT:  Yes.  Thank you.

12             THE COURT:  Okay.  Anything else at this

13 time, Mr. Ballin?

14             MR. BALLIN:  No, Your Honor.

15             THE COURT:  Ms. Willis?

16             MS. WILLIS:  No, Your Honor.

17             THE COURT:  All right.  Thank you, ma'am.

18             You will all be excused.

19             MR. BALLIN:  Thank you, Your Honor.

20             (End of Proceedings.)

21

22

23

24

25

UNREDACTED TRANSCRIPT

1          I, Kristi Heasley, do hereby certify that the

2    foregoing 43 pages are, to the best of my knowledge,

3    skill and ability, a true and accurate unredacted

4    transcript from my stenotype notes in the matter of:

5    UNITED STATES OF AMERICA

6                                              )
     VS                                        )NO. 1:19-CR-10041
7                                              )JACKSON, TENNESSEE
                                               )
8    BRITNEY PETWAY, N.P.                      )

9

10

11          Dated this 21st day of January, 2020.

12

13

14   /s/  Kristi Heasley

15   ---------------------------------
     Kristi Heasley, RPR
16   Official Court Reporter
     United States District Court
17   Western District of Tennessee
     Eastern Division
18

19

20

21

22

23

24

25

                         UNREDACTED TRANSCRIPT